Mr. Tully, is Zeising the correct pronunciation? Zeising, yes. May it please the court, Fred Tully on behalf of Plaintiff Appellant Reed Zeising. This appeal involves the issue of whether the court below based its summary judgment on facts that were genuinely in dispute. At issue was the plaintiff's claim that there was an oral contract or partnership formed between the two parties in June of 2011 to pursue a business venture of Popeyes fried chicken franchise restaurants in Louisiana. The court below in its reasons found that there was evidence of such an agreement. But even assuming such an agreement existed, it was interim in nature and it terminated or ended roughly two weeks after it was reached because the parties pursuant to that agreement took the first step in forming a limited liability company in Georgia. They filed the articles of organization but nothing else. No operating agreement, no other signed agreement spelling out who owns what, who would be the manager. But they did file the papers with the Secretary of State in Georgia and the court held that terminated or ended the verbal agreement if one existed. How could there have been an oral contract when the terms weren't sufficiently certain to know exactly what an agreement would have been? We contend that there were certainly sufficient terms. The defendants have argued that this LLC that was hoped to be formed and planned to be formed and actually filed with the Secretary of State was nothing but a shelf company, shelf with an F, meaning it had no assets, it was a shell, and until that company was consummated and finalized, everything was up in the air. We submit that there were substantial documentary evidence against that view. Mr. Shelton first signed as manager of Dixie, the proposed LLC, a standstill agreement with the sellers of the 29 restaurants. Then he signed, as manager of Dixie, an asset purchase agreement. Let's get back to my question. You're claiming there was an oral contract. Yes. All right. So tell us what you claim the oral contract said as to the obligations of party number one and party number two. Particularly what your client's obligation was. My client's obligation was to be the back office and the finance end. He was to provide services, which he did. Well, he went along with GE to make a deal. He tried to do that. And he helped make a deal. He worked full time for almost three months. Using Shelton's assets, he did. What a deal he was making. Your Honor, a bad deal by Mr. Shelton does not make it a no deal. The parties shook hands. They agreed to a split of ownership. They agreed how they would pursue this deal. That is, they would form this venture. They would go after 100% financing, which they succeeded in doing. 100% financing. Which means neither one would be required to come up with substantial equity. And the reason is this project. Both of them, as well as GE, and we have an expert report in the record that supports this. It was believed that the purchase price that the sellers were offering these 29 restaurants for was less than the value. Substantially less than the value. By as much as $4 or $5 million. That allows the ventures to get 100% financing, which they pursued diligently. Worked hard at it. Negotiated with GE. Negotiated the terms such that the end of the day loan could carry itself without either of the partners having to come out of pocket with any cash. In Georgia, a partnership is defined as an association of two or more persons to carry on as co-owners of a business for profit and includes a limited liability partnership. That's what they had. And they agreed to be co-owners of a business. And the documents I'm talking about that support that are the documents Shelton signed. After the asset purchase agreement, which was in effect an option, the ventures could walk away from that deal if they couldn't get financing, but the sellers were bound. I didn't think Shelton signed that operating agreement. Not the operating agreement. The asset purchase. Dixie. He signed as manager of Dixie the asset purchase agreement. He also signed an escrow agreement under which $500,000 as earnest money was put in escrow at interest in Dixie's name. That's not descriptive of a shell or a shelf company. When money is put in a bank account in the company's name, earning interest. Then he signed, on behalf of Dixie, a loan application with GE and paid GE a $50,000 deposit to cover GE's costs in reviewing and analyzing the project. GE accepted that. And by the way, as part of that, Shelton, on behalf of Dixie, offered his own assets as additional collateral. Not as a contribution to the equity of the company, but as additional collateral behind the loan. GE accepted that and issued a loan commitment to Dixie. Shelton then bought more time on behalf of Dixie and the asset purchase agreement. In other words, the evidence supports a finding that the parties had a deal. They had a deal in June when they shook hands and agreed to pursue this venture as 70-30 co-owners. This was at the breakfast? At the breakfast. They agreed on all the major terms. 100% financing that they would pursue. They agreed that they would own it 70-30. They agreed that Shelton would be the operator of the agreement. Zeising would help pursue the 100% financing. And everything they did until Shelton withdrew supports that finding. There's evidence in the record that would allow a jury to decide there was a deal. Just to tell you, you will concede this, that to deal with all of these Popeye operations, things sure did move fast in a very, very short length of time. You're talking about a big deal with a lot of money involved, which Shelton is going to be at risk at. How many months? Three, four months? From June until he finally closed it himself. He finally closed it in February. June to February. I thought he called him in August. Is that wrong? No, that's wrong. Next February then. February is when the deal finally closed. It was committed by GE and the sellers mid-October. Mid-October. So you had a number of months that went by. So you have, whether it's fast or not, that's a jury issue. That's a jury issue. And also another jury issue is reasonableness of notice. Both Louisiana law that they claim covers everything but the limited liability company and Georgia law requires reasonable notice if you're going to withdraw from an at-will venture like this. Reasonable notice. That reasonable notice, we believe, is both in the kind of notice as well as the time of notice. Understand that from day one, from the time the parties shook hands and started working towards putting this deal, this venture together, Mr. Shelton told his partner that, yes, I'm willing to use my assets as extracollateral so long as I don't have to come out of pocket. And that's what the two of them worked towards, worked on. Mr. Shelton was free to give his partner notice, look, I've changed my mind. Let's rethink this. We want 100% financing, but let's think of other ways to do it. There would be nothing wrong with that kind of statement, nothing wrong with him coming to his partner and saying, you're 30%, put up 30% of the collateral. And Mr. Zeising owned franchise restaurants himself that he could have offered to GE. That's not what happened. Mr. Shelton decided to take it for himself. Once he learned that GE would accept his collateral and give him 100% financing, he saw no need to carry Mr. Zeising as a 30% owner. The case law, both in Georgia, there's a Walensky case that we cited in our brief, is right on point that a partner owes utmost good faith towards his partner. He is not free to give notice like that simply to take it for himself. The end sum. I mean, I thought that on appeal you had sort of abandoned the idea of the partnership. Not a partnership in Georgia. I said I don't think we had a Louisiana partnership here because the parties agreed to Georgia law. They agreed to form a limited liability company, and they agreed to use the limited liability company to own and operate the restaurants. But that doesn't cover what obligations they had to each other before the limited liability was finally formed and finalized. Both in Georgia and Louisiana, parties are free to contract, to do things together, whether you call it a formal business organization or not. They can agree to do things. Mr. Shelton agreed to pursue the sellers and negotiate a good price. Mr. Zeising agreed to put the numbers together and work with GE to come up with favorable financing for the project. That was their contract. And the partnership is kind of a red herring because we don't have an issue here as to debts that the partnership incurred. What we have is two men, two friends, who contracted, shook hands on it, on how to pursue a business venture. It was not conditional. There's evidence that it's not conditional. This was not a shelf company. In fact, some of these restaurants were not owned by the sellers. They were leased, so they had to sign a credit application to give to the landlords. It spells out the ownership, 70-30. It spells out that Mr. Shelton is the manager. It spells out that the two of them are members of this Dixie Restaurant LLC. All of that evidence we submit was sufficient to create genuine disputes of fact that the jury should have heard. Thank you. All right, thank you. You saved time for a rebuttal, Mr. Talley. Mr. Weems. Good morning, Your Honors. Charles Weems represent the Shelton interest in the case. I must confess I'm a little confused after hearing counsel's argument. I thought I didn't see anything about partnerships being argued in the briefs, certainly not a Georgia partnership, which Judge Trimble, in a very thoughtful and thorough opinion, disposed of by pointing out that Georgia has a specific statute that if the parties agree to form an entity such as an LLC, there is no interim partnership. There is no interim being or entity prior to that LLC. Judge Trimble correctly concluded that in this case, that's exactly what the partners did. That's just like the Denim North America Holdings case in which the parties tried to make the same kind of argument and impose fiduciary responsibilities, and the court in Georgia said, no, we have this statute, Georgia Statute 1486A, that any association formed under this statute, the LLC statute, is not a partnership. It's not another entity. There are no fiduciary duties. I'm going to put that aside. I don't know exactly what he meant by saying that partnership is a red herring, but I think it's clear Judge Trimble came to the proper conclusion there was no Georgia partnership in this case, and there certainly was no Louisiana partnership, and that issue wasn't briefed at all before this court. What was briefed, and I did think and still believe that the issues have crystallized a bit, what was briefed that there was some interim or oral innominate contract that somehow bound Mr. Shelton. Now, the court knows, and I don't need to repeat, what we have here is Mr. Shelton, a Popeyes franchisee who had done this before, who had looked at this very transaction, these very stores, looked at the possibility of acquiring it for the same price using the same collateral only a year before. The credit markets weren't such that he did the deal then, so he came back the next year, and this friend of his from Atlanta, Reed Zeising, had been bugging him about doing a deal, so Shelton said, well, come on, let's look at this deal together. They had a meeting in Scottsdale at which they discussed how they might do the deal if they got there. In Mr. Zeising's complaint, he describes it exactly right. He said the parties agreed to pursue the business transaction. He said that in every brief he's filed, and in fact, in this court, the way it was described was this enforceable oral contract was that the parties would work toward financing, form an LLC to pursue the deal, and explore and negotiate a suitable arrangement. In June, when they met in Scottsdale, as Judge Reveley pointed out, we're talking about a $29 million transaction with properties in two states that was going to require substantial financing and $6 million to $8 million worth of equity in order to make it work. Shelton was hoping that Zeising could bring value to the transaction, that he could help him do this deal some sort of way that would reduce his risk, and they went down that path. Now, they did set up what we refer to as a shelf company, that is, an LLC to be used in the transaction, and Shelton certainly signed some documents on behalf of that LLC. We don't deny that. But everybody knew that the LLC was not done, that it was not a completed transaction. TMC, the seller of the stores, knew that that was incomplete. In the discussions with GE, GE knew that it was incomplete. This is not an apparent authority case. We're dealing with third parties, and we're worried about how did they represent themselves. That's totally immaterial in this case. They did what they said they were going to do. They were pursuing the transaction. They set up this entity to use if the deal made, exactly like Zeising played it in his complaint. In his complaint, he says that they would investigate it, they would look, and if they agreed, then they would sign an operating agreement, get down to business, and do the deal. As it turned out, they got an APA signed on August the 18th, and Mr. Shelton put up his money. Of course, Mr. Shelton's driving this bus because he's the only one that's putting up any money. He's paying for the guy that's running these models that Zeising did. He's paying the lawyer. He puts up the half a million dollars for the APA. Finally, after that APA is signed on August the 18th, on August the 30th, they get a term sheet that shows what Ze is thinking about. It doesn't obligate GE to do anything or anybody else. Shelton signs an application, and that's all it is. It invites a proposal by GE. Nothing more. Everybody in this case, Shelton, Zeising, GE, all said that didn't bind anybody to anything. It certainly didn't bind Shelton to put up any collateral. At this time, Shelton looks around and says, wait a minute, this is the $30 million deal. I'm taking all the risk. We've explored possible alternatives for other equity, other financing, other investors. Zeising's bringing not only no value to this table, he's told me he's going to set up an office in Atlanta, get a $100,000 a year salary, and I'm going to be the gal over here in Louisiana, Texas, operating these businesses. He says, I don't think that's a very good deal for me. I don't think I want to do that. So he tells, he doesn't hide anything. This is within 30 days of the time they signed the APA. He calls up Zeising and said, look, man, I hate this because I think you're a good guy, but I'm going to have to do this deal by himself. I suggested to the court any reasonable person would have come to the same conclusion, any reasonable person. So where are we today? Zeising says when we sat down in Scott's deal, even though we didn't know what we were buying, what we were paying, what we could borrow, how much equity was required, what the terms of the loan might be, how we were going to pay it back, even though we didn't know any of the myriad facts that were required to get this thing done, we had an enforceable contract. I suggested to the court no reasonable person can come to that conclusion. Judge Trimble certainly didn't come to that conclusion. Now, not only does this fail under the Louisiana law that is applicable, by the way, if you do any conflicts analysis, regardless of the argument that's been made, there's been no authority to show how Georgia law would apply to a contract between these parties. If you do any look at this, you'll see that there is no definite object. There can be no mutuality or consent because they don't even know what they're contracting for. They can't define a contract at this point. But if that weren't enough, you're dealing with matters which Louisiana law and Georgia law, for that matter, require to be in writing. Let me compare this for you. Suppose I came up to you and said, I would like for you and I to go buy that piece of real estate in Baton Rouge, and I'll tell you what, I'll put up my other collateral to secure our loan at the bank to do so. Now, there we have a really simple transaction, right, and we know exactly what we're doing. Well, you know and I know that that oral promise is not enforceable for a couple of reasons. It deals with immovable property and it involves suretyship, a promise to pay the debt of a third party or to guarantee it. So it's not enforceable. Put that example I just gave you and put it to about the power of 10 or 100 and you've got this transaction. You've got an unknown object, myriad facts that aren't known, and no writing. And these are not unsophisticated parties. As Mr. Zeissing pointed out in his brief, he's got a degree in international economics from Michigan. He worked in New York and London and Paris. He was a head of a public company. I mean, if there was any disparity in position, if we were looking at a fiduciary analysis, it certainly wasn't Mike Shelton, although Mike was the successful one and the one who had the business. If Mr. Zeissing can turn what happened in Scottsdale at breakfast, as Judge Trimble said, over huevos rancheros, into a carried interest, a 30% interest that's carried in a $30 million deal, then he did, in fact, get quite an education. Judge, there is no contract here. It's not possible. Now, Mr. Tully didn't talk about fiduciary duty, but I don't want to let that go by without talking about it a little bit, because if you read what Zeissing said, and we quoted it in our brief, Zeissing doesn't claim that Shelton was obligated to put up his entire patrimony, and yes, there is evidence in the record for that. It's in Shelton's affidavit, and it's also in his deposition when Mr. Tully deposed him. He described it as all his assets and his life savings. That's what Shelton was going to have to put up to make this deal work. Well, when the arrangement was made, the parties decided that we're not going to become members in this thing until we get down the road and we know what the deal is and we agree. Shelton was at least that careful in dealing with Mr. Zeissing. They got down the road. They didn't agree. They never... Shelton is not a member of this LLC. Is he a manager? Sure, he signs some things for the shelf company, but Georgia law requires in order for there to be managers, they have to be identified in the Articles of Organization or in a written operating agreement. There is no written operating agreement that was signed by the parties. Zeissing frequently refers to the unsigned operating agreement that was drafted by the council and sent to the parties for consideration but never signed, but that doesn't bind anybody to anything. It was intended to be signed if they negotiated it and finally got to that point, but they didn't. It was never signed. It can't bind anybody. So if Shelton is not a manager and Shelton is not a member, by definition he can't be a fiduciary to an LLC. He just can't. And if you step back from this, and this is a matter of law. There are no factual disputes in there. If you step back from that and you think about the relationship of these parties, there's no fiduciary relationship between Shelton and Zeissing. He's not transacting business for Zeissing. He's not using Zeissing's money or property. He's not acting like an agent that is trusted and has confidences and is doing things that should impose the highest degree of trust and care and concern like a lawyer or an agent. That's just not the relationship. So the attempt to impose an artificial, I would say, fiduciary relationship on Mr. Shelton and use that artificial fiduciary relationship to say he took a corporate opportunity that belonged to this shell company is just legally insufficient because, for the most fundamental reason possible, Shelton is not a fiduciary. And if you're not a fiduciary, you don't have that obligation. Judge Trimble, in his very careful opinion, went even further. He said if somehow Shelton were found to be a fiduciary, it's clear that under the law of corporate opportunity in Georgia, Dixie Restaurant Group did not have the wherewithal to do the deal without Mike Shelton's collateral and his equity. So one of the requirements for the taking of a corporate opportunity is that the company must have the ability to do the deal. It must have an expectancy in the project. In this case, this was Shelton's deal from the get-go. It wasn't this shelf company's deal, which, in my opinion, frankly, Your Honor, now that we're where we are, I think is only a nominal party. I don't think it has a substantive interest in what's going on, but it's clear that Mike Shelton was not a fiduciary. It's clear that there was no oral agreement between these parties that was confected in Scottsdale, Arizona. The suggestion that Mr. Shelton's application for a loan somehow bound him to put up this collateral is denied by Shelton, by Zeising, and by GE. The suggestion that GE's issuance of a commitment later, after Shelton had told Zeising, hey, man, I'm doing this by myself, I'm not doing it with you. There was a lot of stuff that went on in there. It's really not material to what occurred. But later they issued a commitment to Dixie, to the shelf company. And the suggestion that when they did, that somehow was the acceptance of an offer is not supported in the papers. There's no authority for that, because if you read the commitment itself, and Judge Trumbull went to lengths to get rid of this argument too, if you read it, all it is is a proposal for them to do business with the company. Until that was accepted, which it never was, it was rejected because it was not acceptable by Mr. Shelton when the whole deal was shut down, before he picked it up later, because the head of GE Franchise Finance sought him out at a convention and said, please come back and let's see if we can't rework this thing. There just was nothing ever binding anybody in this transaction. Mike Shelton pulled out of the transaction on September 12th when he called Reed Zeising, he sent him an email the next day, he notified GE immediately, and from then on, Zeising was out of the picture. There was no contract between those two to do anything. There was an agreement to chase this transaction to see if they could make it work. Mike Shelton made the same decision any reasonable businessman would have made under those circumstances. I'm the guy putting up all the money. I'm putting up my entire life savings. I'm taking all the risk. I'm not going to give up 30% for a guy that's not bringing value and is only bringing expense. Your Honor, I suggest, as a matter of law, the way Judge Trumbull handled this case was exactly correct, and I respectfully request that his judgment be affirmed. All right, thank you, Mr. Weems. Mr. Tully, you've saved time for rebuttal. Mr. Weems gave a very compelling closing jury speech as to no contract, but Judge Trumbull said there was evidence of a contract and it had an object, which is these two gentlemen agreed to split up the profits, split up the responsibilities. They had a goal in mind to buy 29 specified Popeye's restaurants and how to finance it. They're going to try to finance it 100% financing, preferably through GE, but if they couldn't work that out, they'd find somebody else. They had an object, a goal in mind, and they shook hands on it. That's a contract, Louisiana and Georgia. And to hold, as Judge Trumbull did, that that contract somehow ends when they took the first step in pursuing their goal in forming an LLC, that automatically ends it. That's, in my mind... I called it Catch-22 in our brief. A better description is King's X. You don't get out of a contract that easily unless the parties spell it out ahead of time. Our obligations to one another, our obligations to pursue this deal jointly, end when we file the papers with the Secretary of State and thereafter we're free to go our own ways. That's not the deal, that's not the evidence, and I submit that this case should go to a jury to decide, was there a contract? What are the terms? Do the documents that Shelton signed create sufficient evidence of what that agreement was? Was there reasonable notice given by Mr. Shelton when he tried to get out of the deal? All of those are jury questions. We submit that the summary judgment should be reversed and this case remanded for trial. Thank you.